**ENGLISH & MERSICK CO. v. EATON, Collector of Internal Revenue.**

(District Court, D. Connecticut. May 2, 1924.)

No. 2604.

Internal revenue ☞8—In computing excess profits, surplus actually undivided
and employed in the business constitutes "invested capital."

Under Revenue Act 1918, § 326a (Comp. St. Ann. Supp. 1923, §
6336⁷/₁₆i), providing that for the purposes of computing excess profits
taxes the term "invested capital" for any year means "(3) paid in or
earned surplus and undivided profits, not including surplus and undivided
profits earned during the year," surplus earned by a corporation during
previous years, actually remaining and employed in its business, invested
largely in machinery, stock in trade, etc., though by annual resolution it
has been divided as profits and credited on the books to the individual
stockholders, is not borrowed capital, but constitutes "invested capital."

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Capital Invested.]

At Law. Action by the English & Mersick Company against Robert
O. Eaton, Collector of Internal Revenue. Judgment for plaintiff.

Henry F. Parmelee, of New Haven, Conn. (Thomas M. Steele, of
New Haven, Conn., on the brief), for plaintiff.

Allan K. Smith, U. S. Atty., of Hartford, Conn., and Philip M.
Clark, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C.,
for defendant.

THOMAS, District Judge. The plaintiff brings this action to re-
cover $16,608.92, with interest from July 20, 1922, for excess profit
taxes for the calendar year 1918, alleged to have been unlawfully as-
sessed against it and thereupon paid under protest. The plaintiff's
income tax return for 1918 claimed an invested capital, which the
plaintiff now concedes should have been $438,504.72. Upon auditing
this return the Commissioner of Internal Revenue disallowed $391,-
892.13 as part of the plaintiff's invested capital, and thereupon rede-
termined the taxes for 1918, and assessed the additional amount herein-
before stated.

Prior to 1918, it had been the custom of the plaintiff to pass annual
resolutions relative to profits, and these resolutions were identical and
as follows:

"It was moved and voted that the net profit for the year ending December
31, 1916, be divided pro rata with the stockholders as the individual holdings
appear and credit the amount to the individual surplus accounts standing in
the names of the stockholders."

In January, 1918, the resolution was as follows:

"It was moved and voted that the net profits remaining after deducting sal-
aries, expenses, and war excess profits taxes be divided in the following pro-
portions and the amounts credited to the individual surplus accounts of the
stockholders: John B. Kennedy, 52 per cent.; Fred T. Bradley, 45 per cent.;
Carl W. Johnson, 1½ per cent.; Seymour M. Bradley, 1½ per cent."

On January 1, 1918, the books of the plaintiff company showed di-
vision of surplus credited to the accounts of each of the four persons

above mentioned; the largest amount being credited to John B. Ken-, nedy in the sum of $201,031.62. In their annual individual income tax returns, filed with the Commissioner of Internal Revenue for the year 1918, each of said individuals returned as taxable income the annual profits for the year 1918. In that year, and without any formal corporate votes, debits and credits were made upon the books of the corporation with reference to the division of surplus accounts, which purported to credit the aforenamed individuals monthly with a certain proportion of the surplus. During the year 1918 the collective sum paid to the stockholders amounted to $71,668.62, which sum consisted of surplus drawings from the profits. It is stipulated that, if the sum of $391,892.13 credited on the books of the corporation to the division of surplus accounts of the shareholders constitutes invested capital of the plaintiff, then there has been an overpayment of the tax by a sum which, with interest, amounts to $16,608.92, which sum is the amount due to the plaintiff, with interest thereon from July 20, 1922, to the date of judgment, if the issues be decided in favor of the plaintiff.

Trial by jury was waived, and in addition to the stipulation testimony was taken by the court. From that testimony it appears that Messrs. Kennedy and Bradley owned 97 per cent. of the stock of the plaintiff corporation, and that the present capitalization is $407,400; said capitalization having been increased from an original authorized capitalization of $20,000 at a time subsequent to 1918. At the close of 1918 there was, in addition to the initial capital of $20,000, capital to the extent of $391,892.13 actually employed in the business of the corporation, which capital consisted largely of machinery, stock in trade, etc., and which would have been incapable of physical distribution without actually terminating the business of the corporation. This capital represented accretions over a number of years, accretions built up solely out of the profits of the business. It also appears that, in the financial statements made by the corporation to its bank and to the credit agencies, this capital was treated and considered as assets of the corporation, upon which it procured a credit rating of from $300,000 to $500,000. It also appears that in these credit statements there was an item, under the heading of "Capital Liabilities," as follows: "Surplus January 1, 1918, $391,892.13"— and that no part of this sum ever had been actually paid out or distributed in any way to any of the stockholders.

To decide the controversy at bar we must determine the status of this $391,892.13 in the light of the provisions of the Internal Revenue Act. It is the contention of the plaintiff that this sum constituted invested capital within the meaning of that act, and that the plaintiff corporation should therefore have been allowed a proper deduction for the employment thereof. The government contends, on the other hand, that this sum did not constitute invested capital within the meaning of the act, but constituted, in fact and in law, borrowed capital, and that therefore no deduction was allowable for the use thereof. In support of its conclusion the government contends that the annual resolution adopted by the corporation constituted, in fact and in law, declarations of dividends; that such intent to declare dividends was also manifested

by the bookkeeping entries hereinbefore recited, as well as by the individual tax returns made by the stockholders, in which these sums were returned as income; and that the resolutions and bookkeeping practice in fact and in law segregated this sum from the capital of the corporation, and vested the ownership of it in the stockholders, who thereupon became creditors of the corporation in the respective amounts credited to them. The contention of the government therefore is that this surplus was borrowed money, or in the nature of borrowed money, and that as such it cannot be treated as invested capital of the corporation for taxing purposes.

The question as to whether or not the annual resolutions of the corporation, quoted supra, were in fact and in law declarations of dividends, is by no means free from doubt. It is, of course, unnecessary to employ some particular terminology in order to declare a dividend. On the other hand, neither the government nor the corporation is necessarily bound or concluded by the language of any resolution in the ascertainment of the corporate intent. For instance, when surplus has in fact been distributed, the government will not be bound by a declaration of the corporation that said division of surplus constitutes a salary payment. If the fact is that it constituted a division of surplus, it will be treated as such, and the tax will be determined accordingly. Reason and justice would therefore seem to indicate that the converse of that proposition should also be true, and that where surplus has not in fact been divided it should not be regarded as divided in law.

This much is conceded: That irrespective of the language of the resolutions, and irrespective of the bookkeeping entries, the sum in dispute never in fact was distributed. This sum represents the accumulations over an extended number of years. If the bookkeeping entries indicate the relation of debtor and creditor between the stockholders of the corporation, the statements made by the very same individuals to their bank and commercial credit companies indicate the reverse. Much of the discussion contained in the elaborate and exhaustive briefs of counsel involves an assumption which requires examination. That assumption is that, if as to this disputed sum the relation of debtor and creditor existed between the corporation and its stockholders, then this sum could not have constituted invested capital of the corporation within the meaning of the Revenue Act. Proceeding upon this assumption, much discussion was expended in the effort to establish on the one hand, and to negative on the other hand, such relation. It is possible, however, that an examination of the statute may lead to the conclusion that the point in issue does not necessarily turn upon this question at all.

The statute applicable to the present controversy is the Revenue Act of 1918 (40 Stat. c. 18, p. 1057, title 3, War Profits and Excess Profits Tax, p. 1088), in which the term "invested capital" is defined at page 1092, as follows:

"Sec. 326 (a). That as used in this title the term 'invested capital' for any year means (except as provided in subdivision (b) and (c) of this section);

"(1) Actual cash bona fide paid-in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid-in for stock or shares, * * *

"(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year.

"(4) * * *

"(5) * * *

"(b) As used in this title the term 'invested capital' does not include borrowed capital."

(c) This relates to deductions on account of inadmissible assets and is not material to this case.

Comp. St. Ann. Supp. 1923, § 6336⁷/₁₆i.

It will be noted that the act contains no legislative definition of the term "undivided profits." Taking the term in its ordinary meaning, it would obviously indicate profits which had not been, in fact, divided or distributed. We are then confronted with the question whether the de jure division of profits accomplished by a declaration of dividends, where such dividends are not actually distributed, constitutes a dividing of profits within the meaning and intent of the Revenue Act, supra. From other provisions of the Revenue Act it is obvious that the legislative intent was to provide for a graduated reduction of taxes in instances where invested capital is employed. While the legislative motive is not disclosed, we may indulge the inference that such tax reduction was intended to operate as a compensation for the employment of capital, and that, therefore, one of the actual objects to be attained was to encourage and reward the actual and productive employment of capital. Such employed capital was to be considered "invested capital," except in instances of borrowed capital.

A de jure division of surplus effected by a declaration of dividends does not serve to alter the title to that surplus until the same is actually distributed. That surplus, until it is physically segregated and allocated to the respective stockholders, merges in the general body of the corporate assets, the title whereof inheres in the corporation. It is quite true that the stockholder, upon the passage of a resolution declaring dividends, if published, becomes instanter a creditor of the corporation, but in this respect he stands in no position superior to that of any other creditor. If a merchandise creditor cannot claim title to corporate property, neither can a dividend creditor. It must be conceded, then, that the title to the assets employed by the plaintiff in 1918 was in the plaintiff corporation. In other words, these assets consisted of property belonging to the plaintiff. They did not come to the plaintiff by way of a loan. There was no pretense that the machinery and plants of which they largely consisted were actually loaned to the corporation; it did not borrow them. Nor is there any claim that an actual loan of money was made by the stockholders to the corporation for the purchase of this plant and equipment. And if we go the full length of the contention of the defendant that these were declared dividends, there still would be no loan. A stockholder to whom a dividend has not been paid cannot declare on a loan. He may sue for the dividend, but his action is not for money loaned.

If, then, these assets were not loaned to the plaintiff corporation, they never were, even in legal theory, divided from the body of the corporate assets. Whatever status they may have assumed within the conventions of accounting practice, they were, de facto, property of the

corporation employed in the prosecution of its business. If the declarations of the dividends served to rob them of their character as surplus within the meaning of accounting technique, that characteristic might, nevertheless, continue to inhere in them within the meaning of the Revenue Act. On any other theory, section 326 (b) loses all possible significance. As above quoted that clause reads:

"As used in this title, the term 'invested capital' does not include borrowed capital."

Now clause (a) has already defined the term "invested capital" to mean money or property paid in for capital stock and also to cover earned surplus and undivided profits. If the term "surplus," as here employed, was intended to mean the sum remaining over and above all kinds of indebtedness, there would have been no point in the specific provision as to borrowed capital. As borrowed capital carried its own liability, it would have to be deducted and excluded in any event before surplus could be ascertained. Obviously, then, the legislative mind contemplated a contingency in which earned surplus .and undivided profits might have existed in fact, despite an accounting charge against them; and from the nature of this case this contingency could only involve an instance where the profits were permitted to remain in the corporation for actual use in its business, despite the legal right of the stockholders to withdraw the same, for the act is concerned with realities and practical purposes. If its object was to encourage the actual conservation of capital and industry by compensating the same, that purpose was satisfied when the assets were actually retained and employed in the prosecution of the corporate business, irrespective of the technical right of stockholders to possess themselves of the same.

A like conclusion is reached when we determine the significance of the word "undivided" in its context. It is obvious that a profit which has in fact been divided has no further existence as a profit. It could not have been actually distributed to the stockholders and at the same time have been actually retained in the corporation. If within the meaning of the Revenue Act a theoretical division of profits is the equivalent of an actual division, then the term "undivided profits" is tautological, for all retained profits are undivided. If, then, any significance is to be attached to the word "undivided," it must be that "undivided" means undivided in fact, even though not undivided in theory.

The conclusion thus reached renders unnecessary the determination of the question as to whether or not the corporate procedure actually resulted in the declaration of a dividend. It is sufficient for the purposes of this case to hold that the sum of $391,892.13 was, within the meaning of the Revenue Act of 1918, earned surplus and undivided profits employed in the prosecution of the plaintiff's business. Judgment, therefore, may be entered for the plaintiff to recover from the defendant the sum of $16,608.92, together with interest at 6 per cent. per annum on said amount from July 20, 1922, with costs to abide the event.

Decree accordingly, together with a certificate of probable cause.