SOUTHPORT MILL, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1676.  Promulgated April 29, 1927.

We are not convinced that stockholders contributed a paid-in surplus to the petitioner, the amount of which should be included in invested capital as defined in section 326 of the Revenue Act of 1918.

*Isom J. Guillory, Esq.,* and *E. Barrett Prettyman, Esq.,* for the petitioner.

*M. N. Fisher, Esq.,* for the respondent.

This proceeding involves alleged deficiencies in income and profits taxes for the fiscal years ended May 31, 1918, and May 31, 1919, in the amounts of $10,484.57 and $8,923, respectively.

The petitioner has admitted the correctness of approximately $1,124 of the deficiency for the earlier year and approximately $3,449 of the deficiency for the later year, but in its petition it alleges the following errors:

A. The Commissioner of Internal Revenue has refused to permit the petitioner to include in invested capital for the year 1918, bona fide paid-in surplus, amounting to $262,500.00, paid in as follows: May 1, 1916, $125,000.00; June 1, 1917, $72,500.00; and June 1, 1917, $65,000.00.

B. The Commissioner of Internal Revenue has refused to permit the petitioner to include in invested capital for the year 1919, bona fide paid-in surplus, amounting to $276,979.47, paid in as follows: May 1, 1916, $125,000.00; June 1, 1917, $72,500.00; June 1, 1917, $65,000.00; and Jan. 1, 1918, $35,000.00. The last amount averaged for 151 days equals $14,479.47.

### FINDINGS OF FACT.

The petitioner is incorporated under the laws of the State of Louisiana, and has its principal office in New Orleans. It is engaged in the manufacture and exportation of cottonseed products. Its books of account were kept and its income-tax returns were made on the basis of a fiscal year ended May 31. The stockholders of record on April 20, 1916, and the number of shares held by each stockholder were as follows:

| Stockholders. | Number of shares. |
|---|---|
| A. D. Geoghegan | 1 |
| Mrs. A. D. Geoghegan | 124 |
| C. B. Coate | 120 |
| M. B. Coate | 5 |
| Chas. Monsted | 45 |
| Mrs. C. Monsted | 5 |
| H. Guldmann | 50 |
| A. Q. Petersen | 25 |
| N. O. Export Co. (C. Monsted) | 50 |
| N. O. Export Co. (H. Guldmann) | 50 |
| N. O. Export Co. (A. Q. Petersen) | 25 |
| Total | 500 |

The corporation was making money in its business in 1916, and the two stockholders named Coate, who were husband and wife, wanted a large cash dividend out of the earnings of the business. Certain other stockholders deemed the payment of large cash dividends inadvisable because the corporation needed money with which to operate and had had difficulty borrowing from banks. On April 12, 1916, the following written agreement was entered into:

On this day, the following agreement was entered into between Southport Mill, Limited, New Orleans, Louisiana party of the first part, and Chas. Monsted; Mrs. Chas. Monsted; A. D. Geoghegan; Mrs. A. D. Geoghegan; H. Guldmann and A. Q. Petersen parties of the second part as follows:

WHEREAS it is contemplated on the part of the Southport Mill, Limited, that a dividend will be declared at the close of each fiscal year on May 31st, the amount of which dividend is expected to be paid in cash to the minority Stockholders only, and

WHEREAS it is understood between the parties to this Agreement that any subsequent dividends that would ordinarily accrue and be payable to the aforesaid parties of the second part along with other Stockholders is intended to remain in the Treasury of the Southport Mill, Limited as though no dividend had been declared.

WHEREAS the said parties of the second part hereby agree in accordance with the foregoing that they will not avail themselves of the aforesaid dividends subsequently declared, but do hereby bind themselves to allow the aforesaid dividends to remain in the Treasury of the Company for the purpose of providing a sufficient working capital for the successful operation of the business, and

WHEREAS in order to place the parties of the second part on an equal basis with the other Stockholders to whom any of the aforesaid dividends may be paid in cash,

It is understood between the parties to this agreement that whenever any of the aforesaid dividends shall be actually paid to the parties of the second part, or any one of them that in addition to the amount of the dividends there shall be paid to the parties of the second part only an extra dividend, of 6% per annum on the dividends thus retained, until paid.

It is the purpose of this Agreement that whenever any dividend may be declared subsequent to the date of this Agreement that so far as it may relate to the parties of the second part, it shall be a dividend deferred as to its payment until such time as, in the opinion of Southport Mill, Limited, there shall have accumulated in the Treasury a fund sufficient for the successful operation of the business. The amount ordinarily payable to the parties of the second part on the declaration of a dividend shall, therefore, remain in the Treasury of said Southport Mill, Limited, the same as a paid in surplus to be used by them in accordance with the foregoing agreement.

NEW ORLEANS, April 12, 1916.

(Signed)       A. Q. Petersen, Charles Monsted, A. D. Geoghegan, Mrs. A. D. Geoghegan, Hans Guldmann, Mrs. Chas. Monsted.

SOUTHPORT MILL, LTD.
A. D. Geoghegan,
        Manager.

On April 28, 1916, the directors of the petitioner declared a dividend of $250,000, payable on May 1, 1916, as is shown by the following extract from the minutes of the directors' meeting:

On motion of Mr. Petersen seconded by Mr. Coate it was unanimously resolved that a dividend of 500% be, and is hereby, declared on the capital stock of the Southport Mill, Ltd. to be credited or paid on May 1st., 1916, to Stockholders of record on April 20/16.

A debit of $250,000, dated May 1, 1916, was entered upon the books of the corporation against undivided profits and a credit of a like amount was entered under Dividend No. 6. A debit of $250,000 was then entered against Dividend No. 6 and each stockholder was credited with his proportionate share of the dividend. An entry dated the same day was made upon the books of the corporation debiting the six stockholders who were parties to the agreement of April 12, 1916, with the exact amounts which had been credited to them by way of dividends and the total amount of these debits, or $125,000, was credited to " Paid-in surplus, special, as per agreement dated April 12, 1916."

On May 9, 1917, the petitioner declared a dividend of $125,000 payable May 31, 1917, as is shown by the following extract from the minutes of the directors' meeting:

On motion of Mr. Geoghegan seconded by Mr. Monsted it was unanimously resolved that a dividend of 290% be and is hereby declared on the capital stock of the Southport Mill, Ltd., to be credited to stockholders on May 31st., 1917.

Upon the books of the corporation under date of May 31, 1917, undivided profits was debited $145,000, Dividend No. 7 was credited $145,000 and was then debited $145,000 and the stockholders were credited with their proportionate shares of this dividend. Under date of June 1, 1917, those stockholders who were parties to the agreement, were debited with the exact amount which had been credited to them as dividends under date of May 31, and the total of these debits, or $72,500, was credited to " Paid-in surplus, special, as per agreement April 12, 1916."

On June 1, 1917, A. D. Geoghegan, on behalf of himself and certain other stockholders, paid into the corporation the sum of $65,000, and again on January 1, 1918, he paid in $35,000. Each amount was immediately credited to " Paid-in surplus, special."

No written agreement in relation to the payment of these two amounts of money was ever entered into, but it was intended that the money should be paid back to A. D. Geoghegan and that interest in the form of a special dividend would be paid on it. A. D. Geoghegan was president of the corporation. The corporation had always had difficulty borrowing sufficient money from banks with which to operate.

From time to time after the dates of the credits to the account called "Paid-in surplus, special" as above set forth, the petitioner furnished financial statements or balance sheets to some creditors, banks and others. These sheets showed the total amount then credited to "Paid-in surplus, special" as "Paid-in surplus."

During the period involved in this case, the books of the corporation were audited by certified public accountants. Their reports showed the amount of the "Paid-in surplus, special" account. Excerpts from these reports were at times furnished to banks, and a complete report was furnished to any bank which was sufficiently interested to want a complete report.

On June 1, 1917, which was the beginning of the petitioner's fiscal year ended May 31, 1918, the "Paid-in surplus, special" account had a credit balance of $262,500, which remained unimpaired throughout the fiscal year ended May 31, 1918, and was increased by $35,000 credited on January 1, 1918.

On June 1, 1918, which was the beginning of the fiscal year ended May 31, 1919, the "Paid-in surplus, special," account had a credit balance of $297,500, which remained unimpaired throughout the fiscal year ended May 31, 1919.

On May 15, 1919, the board of directors of the petitioner adopted the following resolution:

That WHEREAS Southport Mill, Ltd., is now financially in such a position as to render unnecessary the retention in the Treasury of the deferred dividends amounting to $197,500.00 entered under Paid-In Surplus

That the said amount of $197,500.00 be paid on June 1st., 1919, to the respective stockholders, thus cancelling from that date the agreement dated April 12th., 1916, regarding retention of dividends thus far paid and to be paid in the future.

"Paid-in surplus, special" was debited $197,500 on the books of the corporation under date of June 1, 1919, and the six stockholders, who were the parties to the agreement of April 12, 1916, were credited with their proportionate shares of this debit.

On June 2, 1919, the board of directors of the petitioner adopted the following resolution:

That WHEREAS Southport Mill, Ltd., is now financially in such a position as to render unnecessary the permanent retention in the Treasury of the amount of $100,000.00, being balance left unpaid in Surplus Account

That said amount of $100,000.00 be refunded to Original Depositors.

"Paid-in surplus, special" was debited $100,000 upon the books of the corporation under date of June 2, 1919, and A. D. Geoghegan was credited with $100,000. There were no further entries in this account. No interest was paid on the money involved in these accounts and no extra dividend of 6 per cent, as referred to in the agreement of April 12, 1916, was actually paid.

The following are statements, furnished by the petitioner to banks and others, purporting to show the condition of its finances at the close of business on the dates indicated:

*May 31, 1916.*

### Assets

| | | |
|---|---|---|
| Cash | | $47, 551. 97 |
| Bills Receivable | | 8, 516. 53 |
| Accounts Receivable | | 847, 650. 65 |
| Railroad Claims | | 2, 756. 11 |
| Stock, Terminal Oil Mill Co | $18, 875. 00 | |
| Cattle Food Supply Co | 9, 504. 60 | |
| Southport Service Co | 5, 000. 00 | |
| | | 33, 379. 60 |
| Bonds, Myrtle Grove P. & M. Co | | 700. 00 |
| Office Furniture | | 1, 951. 16 |
| Permanent Investment | | 109, 121. 31 |
| Real Estate | | 12, 250. 00 |
| Laboratory | | 250. 00 |
| Inventory | | 158, 664. 83 |
| | | $1, 222, 792. 16 |

### Liabilities

| | |
|---|---|
| Bills Payable | $277, 445. 00 |
| Accounts Payable | 499, 790. 81 |
| Capital Stock | 50, 000. 00 |
| Paid in Surplus | 125, 000. 00 |
| Undivided Profits | 265, 466. 59 |
| Reserve | 5, 089. 76 |
| | $1, 222, 792. 16 |

*May 31, 1917.*

### Assets

| | | |
|---|---|---|
| Cash | | $23, 092. 51 |
| Bills Receivable | | 8, 522. 50 |
| Accounts Receivable | | 838, 882. 87 |
| Stock, Cattle Food Supply Co | $24, 020. 00 | |
| Southport Service Co | 5, 000. 00 | |
| R. C. Burke & Co | 5, 000. 00 | |
| | | 34, 020. 00 |
| Bonds, Myrtle Grove P. & M. Co | $700. 00 | |
| East Palestine Rubber Co | 150. 00 | |
| | | 850. 00 |
| Office Furniture | | 1, 969. 91 |
| Permanent Investment | | 239, 222. 95 |
| Real Estate | | 19, 750. 00 |
| Laboratory | | 250. 00 |
| Inventory | | 593, 676. 16 |
| | | $1, 760, 236. 90 |

Liabilities

| | |
|---|---|
| Bills Payable | $464,300.00 |
| Accounts Payable | 456,367.48 |
| Capital Stock | 50,000.00 |
| Paid in Surplus | 125,000.00 |
| Undivided Profits | 594,266.34 |
| Reserve | 70,303.08 |
| | $1,760,236.90 |

*May 31, 1918.*

Assets

| | |
|---|---|
| Cash in Banks and Office | $226,890.16 |
| Bonds | 15,850.00 |
| Stocks | 34,010.40 |
| Bills Receivable | 7,922.50 |
| Accounts Receivable | 766,841.39 |
| Mill Investments | 572,505.30 |
| Inventory, Stock of all Products on Hand | 909,894.13 |
| | $2,533,913.88 |

Liabilities

| | |
|---|---|
| Capital | $550,000.00 |
| Surplus paid in | 297,500.00 |
| Surplus earned | 472,413.69 |
| Reserves | 124,078.59 |
| Bills Payable | 660,000.00 |
| Accounts Payable | 429,921.60 |
| | $2,533,913.88 |

OPINION.

MURDOCK: Our problem in this case is to decide whether the $297,500, or any part thereof, carried in this " Paid-in surplus, special " account should go into statutory invested capital as paid-in surplus for either of the years involved and, if it should go in, the date on which it should go in.

The circumstances surrounding the two payments by Geoghegan, one of $65,000 and one of $35,000, do not lead us to believe that either amount constituted paid-in surplus and therefore invested capital within the meaning of section 326 of the Revenue Act of 1918. He paid the amounts to the corporation and the corporation " refunded " the total amount to him. He testified that he paid in the money for and on account of all of the stockholders except Mr. and Mrs. Coate, that the corporation needed working capital, that it was having difficulty borrowing from banks, and that interest on it was waived when it was repaid. There is no evidence of what agreement or understanding, if any, existed between Geoghegan

and the corporation in regard to this money. It was credited to a *special* paid-in surplus account, whatever that may have been. It was only to remain with the corporation temporarily. Mr. and Mrs. Coate were never to share in a repayment or distribution of this money. Apparently no stock was issued, no notes or other security given, and on the other hand no credit was entered to Geoghegan on the books on account of it and no interest was paid for the use of it. Nevertheless, in this corporation the stock was closely held and there is nothing to convince us that this was not a loan and therefore borrowed capital as determined by the Commissioner and as defined in section 325 (a) of the Revenue Act of 1918. We affirm the Commissioner on this point.

The evidence does not disclose the stock holdings for any date other than April 20, 1916. On that date, C. B. Coate and M. B. Coate, husband and wife, together held 125 shares, or one-fourth of the stock of the corporation. The N. O. Export Co. held another 125 shares. We are not informed as to what this company was or why its stock was divided among C. Monsted, H. Guldmann, and A. Q. Petersen, as set out in the findings of fact. In any event six other stockholders owned the remaining 250 shares, or one-half of the stock, and on April 12, 1916, they entered into an agreement in regard to prospective dividends to be declared on their stock. It is argued that because of this agreement something was invested capital within the meaning of section 326 of the Revenue Act of 1918, which otherwise admittedly would not have been such invested capital. See *Appeal of Wm. H. Davidow Sons Co.*, 1 B. T. A. 1215, and *W. E. Caldwell Co.* v. *Commissioner*, 6 B. T. A. 47.

We held in the *Davidow* case, *supra*, that where a dividend is ·declared and payable, but is permitted to remain in the business, it constitutes borrowed capital and can not be included in invested capital. In that case the agreement to leave the money in the business was subsequent to the date of the declaration of the dividends and also to the date on which they were payable. All of the stockholders in that corporation were parties to that agreement. Is this agreement entered into by only a part of the stockholders any more effective merely because it antedated the declaration of dividends?

Before we consider the merits of the petitioner's contention there are certain features of the evidence which we want to mention. The petitioner offered and there were received in evidence two auditor's reports, one purporting to be an audit of the corporation's books as of May 31, 1918, and the other an audit as of May 31, 1919. The first included a balance sheet which showed "Paid-in surplus, $297,500," and the second a balance sheet which showed "Paid-in surplus, special—$297,500." On each this item appeared under liabilities and there appeared among the assets certain "Accounts

Receivable" in substantial amounts. Each report contained a detailed statement of the "Accounts Receivable" in which we find the following items:

### 1918 Audit.

| | |
|---|---:|
| Mr. and Mrs. A. D. Geoghegan, special | $98,750.00 |
| H. Guldman, special | 39,500.00 |
| Chas. Monsted, special | 35,500.00 |
| Mrs. Chas. Monsted, special | 3,950.00 |
| A. Q. Petersen, special | 19,750.00 |

### 1919 Audit.

| | |
|---|---:|
| Mr. and Mrs. A. D. Geoghegan | 98,750.00 |
| Mr. and Mrs. Chas. Monsted | 39,500.00 |
| Mr. H. Guldman, special | 39,500.00 |
| Mr. A. Q. Petersen | 19,750.00 |

These items are unexplained by the record. We note that in each instance they are in the exact amount of the dividends supposed to have been left in the business in accordance with the agreement of the six stockholders named. We do not understand why these amounts would be due from the respective stockholders if in fact their dividends had been left in the business to create the "Paid-in surplus, special" credit balance as the petitioner has contended, and as it attempted to prove by sheets of paper purporting to be copies from the books of the corporation offered in evidence by agreement of counsel. We have stated in our findings of fact the various entries shown by these sheets. If, as a matter of fact, all of these stockholders had withdrawn their dividends in cash when declared and the credit balance to the "Paid-in surplus, special" account then had been entered it would have been necessary to have balanced it on the books with an asset, and if this was done we can readily understand why these amounts appear in accounts receivable as owned by these six stockholders.

If the credit balance in the "Paid-in surplus, special" account was thus created by entering as an asset accounts receivable from each of these six stockholders in the amount of their dividends, we are unable to see how payment of the dividends was deferred in accordance with the proof offered and in accordance with the alleged purpose of the agreement.

These same audits do not show any part of the $100,000 paid in by Geoghegan as accounts receivable. No witness testified that these dividends were not drawn in cash or that they were actually left in the business. Judging by the balance sheets in evidence, the undivided profits account was always larger than the amount of dividends declared.

After considering all of the testimony we are in doubt as to just what was done in regard to these dividends and the "Paid-in sur-

plus, special" account. It may be that these apparent differences can be reconciled, but they have not been explained in the record. Under such circumstances we would be justified in deciding this case in favor of the respondent without further discussion. However, we think that even if the money actually remained in the business our decision should be the same and therefore we continue.

Section 325 (a) of the Revenue Act of 1918, defines "borrowed capital" as "money or other property borrowed, whether represented by bonds, notes, open accounts, or otherwise."

Section 326, in addition to stating that invested capital shall not include "borrowed capital," defines "invested capital" to include "Actual cash bona fide paid in for stock or shares" and "Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year."

In the present case it is contended that a situation was created by a contract whereby holders of 50 per cent of the stock paid in a surplus in which they alone were to share upon its distribution, a surplus which was not theirs individually, but belonged to and was embarked in the business of the corporation. The petitioner, to succeed in this contention, had the duty of proving that the contract was intended to and did accomplish the desired result.

The fourth and fifth recitals clearly show that these dividends were to be preserved for these six stockholders, that they alone were to share in the distribution of them, and that they were to receive 6 per cent per annum on their money. The declaration of a dividend creates a debtor and creditor relation between the corporation and its stockholders as to the amount of the dividend due each stockholder. *W. E. Caldwell Co.*, 6 B. T. A. 47. Therefore, standing alone, the declarations of dividends in this case would have removed from invested capital from the dates of declaration the total amounts of the dividends declared. This would not be changed had the agreement of April 12, 1916, served only to defer the payment of that portion of the dividends due the six contracting stockholders as the last paragraph of the agreement states was its purpose. See Fletcher on Corporations, vol. 6, p. 6066, and cases there cited, especially *Wallin* v. *Johnson City Lumber & Mfg. Co.*, 136 Tenn. 124; L. R. A. 1917B 323; 188 S. W. 577, and *Northwestern Marble & Tile Co.* v. *Carlson*, 116 Minn. 438; 133 N. W. 1014, to the effect that though a dividend is payable upon a day not yet appointed, or at such time as in the opinion of the directors the corporation's finances justify such payment, nevertheless, the debtor-creditor relation arises upon the date of declaration. The last sentence of this last paragraph of the agreement, if it was intended to indicate that the money was to be invested capital and was to belong to the corporation, is directly in conflict with the sentence immediately preceding it, which merely

indicates that the parties consent to the use of their money by the corporation.

In the second recital there is the statement, not entirely free from ambiguity, that, " It is understood between the parties to this Agreement that any subsequent dividends that would ordinarily accrue and be payable to the aforesaid parties of the second part along with other Stockholders is intended to remain in the Treasury of the Southport Mill, Limited, as though no dividend had been declared." Standing alone this paragraph might have the effect contended for by the petitioner. But considering this statement in the light of the entire contract and considering the entire contract in connection with all of the evidence, we are convinced neither that this money was intended to be, nor that it was embarked in the business. See La Belle Iron Works v. United States, 256 U. S. 377. Therefore, no part of these dividends, or of the amount which they represented, should be included in invested capital after the respective dates on which the dividends were declared.

It might be that as to certain creditors to whom the petitioner furnished balance sheets, such as are in evidence, that the principle of estoppel could be invoked by those creditors and that as to them it could not be denied that this money belonged to the corporation. However, the principle of estoppel has no place in this case. It was never demonstrated to what extent such annual statements were published, or held out to customers, banks, or other creditors, and the record does not show the name of any person or firm that was indebted or became indebted to the corporation which received any of the statements introduced. No doubt the object of introducing this evidence was to bring the case within the decision in the case of English & Mersick Co. v. Eaton, 299 Fed. 646, which was affirmed in the Circuit Court of Appeals, 7 Fed. (2d) 54. However, we feel that that decision is not in point. It was there held that a certain resolution of the directors was not a declaration of a dividend. In our case we are convinced that each of the two resolutions was a declaration of a dividend. It would be absurd to hold that the publication of an incorrect financial statement by a corporation in which it included in surplus that which, in fact, was a debt to its stockholders, permits it, as a matter of law, to retain the incorrect amount in its surplus and to include it in its statutory invested capital. Even though such a misstatement by a corporation might make the directors personally liable, and possibly criminally liable, and place the stockholders' claim in a position secondary to the position of the creditors relying on such misstatement to their harm, providing the stockholders had knowledge of and acquiesced in the misstatement, still it does not extinguish the debt of the corporation to its stockholders, but, at most, makes the stockholders' rights second-

ary to the rights of those other creditors. The fact that the debt of the corporation to the stockholders may be secondary to the debts owed general creditors does not change the debt from "borrowed money" to "invested capital." *Appeal of I. Unterberg & Co.*, 2 B. T. A. 274, and *Appeal of Webb Press Co., Ltd.*, 3 B. T. A. 247.

The cases of *United States* v. *Mellon*, 281 Fed. 645, and *United States* v. *Davison*, 1 Fed. (2d) 465, are not in point, if for no other reasons than that in our case we are not convinced from the evidence that by the agreement the money was or was intended to be embarked in the business nor have we heard any evidence to the effect that but for the agreement no dividend would have been declared. In the two cases above cited, it was held in effect that the amount of the dividend was intended to be and was actually embarked in the business and was the property of the corporation, stock was issued for it and but for the agreement no dividend would have been declared.

*Judgment will be entered for the respondent.*

PHILLIPS dissents.

SMITH concurs in the result only.