# UNITED STATES, by LEWELLYN, Collector of Internal Revenue, v. MELLON.

(Circuit Court of Appeals, Third Circuit. June 29, 1922.)

No. 2831.

1. **Appeal and error** ⬥⟾1008(1)—**Findings of fact conclusive on writ of error.**

The District Court's findings of fact are conclusive in the Circuit Court of Appeals on writ of error.

2. **Internal revenue** ⬥⟾7—**Stock issued to stockholder on his purchase of other stock held not subject to "income" tax.**

Where a corporation, which was using its earnings in extending its business and was not in a financial position to declare or pay a cash dividend, in order to secure funds with which to pay existing indebtedness and to conduct its business, adopted a plan providing for the sale at par

---

of an amount of stock equal to the outstanding stock to existing stockholders pro rata, and for the issuance to each purchaser, in addition to the stock purchased at par, 100 per cent. of extra stock, and where large stockholders, to insure the success of the plan, agreed to take and pay for shares declined by other stockholders, the extra stock issued to such a heavy stockholder, who had purchased stock other than his proportionate share, on other stockholders' refusal to subscribe therefor, *held* not subject to income tax, since the receipt of such stock did not increase his income; "income" being something coming to a man.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit by the United States, by C. G. Lewellyn, Collector of Internal Revenue, against William Larimer Mellon. Judgment for defendant (279 Fed. 910), and plaintiff brings error. Affirmed.

Walter Lyon, U. S. Atty., and Warren H. Van Kirk, Sp. Asst. U. S. Atty., both of Pittsburgh, Pa., and Carl A. Mapes, Sol. Internal Revenue, and Andrew J. Aldridge, both of Washington, D. C., for plaintiff in error.

J. H. Beal and W. A. Seifert, both of Pittsburgh, Pa. (Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., of counsel), for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.  In the court below, the United States brought suit against William Larimer Mellon to recover some $70,000 of alleged income tax. Jury was waived and the case tried by the judge, who found a verdict for defendant. Thereupon the United States sued out this writ of error. As the findings by the judge of the facts, concerning which indeed there is no dispute, are final and cannot be retried here, it follows that, if such proofs afforded ground from which it could be inferred the $70,000 involved was not income received by the defendant, the judgment must stand affirmed.

[1] Turning, then, to the findings, we note that the defendant owned 12,655 shares of the Gulf Oil Corporation, the scope and nature of which company's business we avoid here reciting by reference to the various phases of the case of Gulf Oil Corporation v. Lewellyn, as found in Judge Orr's opinion in the District Court, 242 Fed. 709; to Judge McPherson's opinion in the Circuit Court of Appeals, 245 Fed. 1, 158 C. C. A. 1; and to Mr. Justice Holmes' opinion in the Supreme Court, 248 U. S. 71, 39 Sup. Ct. 35, 63 L. Ed. 133.

While the earnings of the company had been large, the facts found show it had never declared, or indeed had been in financial position to declare, a dividend; that its earnings had been used in extension and development; and that it was heavily in debt, its loans being carried on the credit and indorsement of some of its large stockholders. At the close of the year 1912, its affairs called for refinancing, as will appear from the proofs, which show that on December 31, 1912, the corporation had outstanding $11,208,200 capital stock. Its indebtedness was in round numbers $15,000,000, of which $2,750,000 were in accounts payable, and $4,750,000 in bills payable. Against this indebted-

ness the company had quick assets of $12,500,000 made up of oil,.$7,-500,000; supplies, $1,250,000; accounts receivable, $2,750,000; and cash, some $600,000. The situation at that time is thus summed up by the court below:

"While the corporation, through its subsidiaries, had, through the period of its history, earned a large amount of money, these earnings were all put back into and were used in extending, enlarging, and carrying on the business of the corporation. They were represented largely by fixed assets, such as additions to the oil-producing territory of the corporation, the equipment used in the exploration for and the production of crude oil, in stocks of crude oil and of manufactured oils, extension of pipe lines and gathering lines, tanks for the storage of oil, increased capacity of the refiners of the corporation, the purchase of additional vessels for the transportation of oil, and other like matters, and therefore, in the opinion of the directors, the said earnings did not exist in such shape that a dividend thereof payable in cash could be made to the stockholders. In addition thereto, in the judgment of the directors and officers of the corporation, the successful carrying on of the business of the corporation required a large amount of additional capital."

As to the necessity for refinancing, that court said:

"While the corporation had been prosperous, it was without sufficient working capital, save as it was able to borrow money for this purpose, which it had been unable to do by reason of the credit extended to it through its larger stockholders: but, owing to the steadily increasing business done by the corporation, additional capital was required, and in the opinion of its officers and directors the corporation was without credit to obtain such additional capital, save as the same was provided by its stockholders, and some plan of refinancing was necessary."

To meet this situation, the following plan was agreed on and carried out: The capital stock of $15,000,000 was increased to $60,000,000, and it was determined that out of this increase of stock, which was warranted by the past earnings of the company, an amount equal to 100 per cent. of the then outstanding stock, namely, $11,280,200, was to be sold at par for cash, in order to provide the corporation with the funds needed to pay existing indebtedness and to conduct its business. To induce the stockholders to buy this $11,280,200 of stock, every purchaser was to receive, in addition to the stock which he bought at par, 100 per cent. of extra stock. It was expected that substantially all of the stockholders would purchase their pro rata of stock and would receive this additional 100 per cent. of issued stock, but in order to insure the plan all of the directors of the company, including W. L. Mellon, the defendant, who were large stockholders, agreed in advance to so accept and pay for their proportionate amount of stock, and at the same time A. W. Mellon and R. B. Mellon, who were large stockholders, who had indorsed the outstanding paper of the company in procuring its credit, agreed that, in case any stockholders should decline to take their proportionate amount in stock, they would take and pay to the corporation par for all such declined shares. It will be seen that by this arrangement the success of the plan was insured in advance and any stockholder outside of the persons above named, who declined to subscribe for stock, could receive the stock, which he would otherwise have received, in cash. The court found that:

"Without such understanding and agreement the said dividend of 100 per cent. could not and would not have been declared."

And it further found that:

"At the time of the declaration of said dividend and the payment thereof, the corporation did not have cash with which to pay the same or any substantial part thereof, and all of the cash which it did have at March 31, 1913, and at April 15, 1913 (with the exception of less than $3,000) was the proceeds of the sale of the newly issued stock."

The net result of the transaction was thus found by the court:

"After the transaction the defendant had two shares to represent the interest in the same property which prior thereto was represented by one. After the transaction, there were twice as many shares of the corporation in the hands of the stockholders as there were before. The corporate assets had not been diminished by the transaction. Therefore, for two shares which defendant possessed at the close, there was for him the same value as for one share represented at the beginning."

It will thus be seen that the whole transaction was a means, not of paying out money to shareholders, for the company had none to pay out, but was a means of obtaining from the shareholders the paying in of new money which the company needed to meet its existing indebtedness and provide it with proper working capital; and, so far as any cash was paid to stockholders, W. L. Mellon, the defendant, had bound himself by agreement not to receive any, but, on the contrary, to pay additional cash into the company, and such payments as were made to the smaller stockholders were simply an equitable and fair way of allowing those who did not desire to put further money into the company to get the value of their stock, not from the corporation itself, but through the medium of the underwritten money furnished by T. Mellon & Sons, who in effect took their place and paid the needed money into the company.

[2] From all of this it is quite evident that all of the acts of the company, whether called issues of stock or declarations of dividend, were in fact and reality a refinancing of the corporation, in which this defendant and other large stockholders bound themselves to pay, and in fact did pay, into the company's treasury the additional capital which it required. Their position was not that of having an option to take stock or to take money, but it was an obligation to take stock for which they agreed to pay. The common understanding of "income" is something coming to a man, and is not aptly described by a transaction where he is forced to pay, and does pay, money to a company which did not, and was not able to, pay dividends, and which therefore was not able to increase his income.

We are of opinion the court below was justified under the facts in finding the defendant received no income from the Gulf Oil Company, and was therefore not liable to the government to pay the alleged income tax for which this suit was brought.

The judgment below is therefore affirmed.

Judge WOOLLEY, while if he exercised an independent judgment would be for reversal on grounds appearing in this court's opinion in Lewellyn v. Gulf Oil Corporation, 245 Fed. 1, 156 C. C. A. 1, never-

theless, concurs in the conclusion now announced by the court because he considers that he is constrained so to do in virtue of the controlling effect of the decision of the Supreme Court in Gulf Oil Corporation v. Lewellyn, 248 U. S. 71, 39 Sup. Ct. 35, 63 L. Ed. 133.