OLD COLONY RAILROAD CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18813.   Promulgated November 19, 1929.

*J. S. Y. Ivins, Esq.*, and *Joseph D. Brady, Esq.*, for the petitioner.
*Arthur H. Fast, Esq.*, for the respondent.

272

274

OPINION.

TRUSSELL: Two of the issues raised by petitioner need little discussion as they each involve a question which has been heretofore presented to us and decided upon facts similar to those here involved. One of these issues is the so-called "tax on tax" question, or whether payments of Federal income taxes by the lessee for account of the lessor, as required by the terms of the lease, constitute additional income to the lessor. That such payments represent additional taxable income was held by the Supreme Court in *Old Colony Trust Co. et al., Executors,* v. *Commissioner of Internal Revenue,* 279 U. S. 716, and *United States* v. *Boston & Maine Railroad Co.,* 279 U. S. 732, both decided June 3, 1929, and we accordingly have for determination here the question of what income of this character received by petitioner constitutes income for the calendar year 1921. Respondent in determining the deficiency has included the amount of Federal taxes in respect of income for that year and which were due and payable in 1922 and paid in that year by the New Haven, but asks, in the event that such taxes are held not to represent income for 1921, that the deficiency be redetermined by including in petitioner's income the sum of $155,339.49 income and profits taxes of petitioner for 1920, due and paid by the New Haven in 1921 for account of petitioner. We hold that the Commissioner was in error in including in income for 1921 the amount of Federal taxes for that year not due or payable and not paid until 1922. *Norwich & Worcester Railroad Co.,*

2 B. T. A. 215; *United States* v. *Norwich & Worcester Railroad Co.*, 16 Fed. (2d) 944. We further hold that the $155,339.49 of Federal income and profits taxes of petitioner for the calendar year 1920 due and payable in 1921 and paid in that year by the New Haven for account of petitioner represents additional income in that amount to the latter for 1921. *Providence & Worcester Railroad Co.*, 5 B. T. A. 1186; *Old Colony Trust Co. et al., Executors*, 7 B. T. A. 648; *Houston Belt & Terminal Railway Co.*, 6 B. T. A. 1364.

The second issue is upon respondent's inclusion in petitioner's income for 1921 of a proportionate amount of the premiums received by it prior to 1905 on sales of its bonds which are not yet due and payable, respondent having prorated such premium over the life of the bonds and allocated $6,960.64 thereof to income for that year. In *Old Colony Railroad Co.*, 6 B. T. A. 1025, this same question was presented with respect to this petitioner's tax liability for 1920 and we held that respondent's action in prorating the amount of such premiums as income of current years during the bond period was in error and this decision was affirmed by the Circuit Court of Appeals, 26 Fed. (2d) 408. Under authority of that decision we held that no part of the premiums in question represented income to petitioner in 1921.

This brings us to consideration in the light of facts here proven, of the question of whether petitioner was affiliated with the New Haven in 1921. The question is a vital one in this proceeding, as it is admitted by stipulation that the New Haven sustained a net loss in this taxable year sufficient to absorb any net income found as received by petitioner, and if it be found that affiliation as defined in section 240 (c) of the Revenue Act of 1921 existed, the result would wipe out the liability not only for the deficiency determined but for the tax already paid for that year. The section in question reads as follows:

(c) For the purposes of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

In *Old Colony Railroad Co.*, 1 B. T. A. 1067, this same petitioner, for the year 1918, upon proof of the same facts as shown herein as to operation of its railroad and properties under this same lease and the ownership during that year by the New Haven of 98,122 shares of its stock, claimed affiliation with the New Haven, and we held this proof insufficient to show " ownership or control of substantially all " of its stock by the New Haven and denied the claim of affiliation. However, the claim is here asserted as to a different year and is to be determined upon the proof adduced as to conditions existing

in that year. We have no reason to question the correctness of the conclusion reached by us upon the proof submitted in the former case cited and if no facts in addition to those proven in that case were shown as to the year here in question, we should hold that no affiliation existed. Petitioner, however, attempts to meet the situation by proving additional facts which it contends, when considered with the facts proven in the former case, and which are also proven on the present proceeding as existing in the taxable year now before us, show that the New Haven controlled substantially all the stock of petitioner in that year.

An examination of the facts found in the former proceeding and the evidence submitted in the present case show that similar conditions existed in the two years with respect to operation of petitioner's properties by the New Haven under the lease in question and the ownership by the latter of 44 per cent of petitioner's outstanding stock, it being the largest individual stockholder, the next largest stockholder owning 4,200 shares. In the former year it was shown that the 18 next largest stockholders owned a total of 10,521 shares and that the balance of petitioner's 222,940 shares of stock outstanding was owned by 4,666 stockholders, none of whom owned individually more than 400 shares. In the present proceeding it is shown that the 18 next largest stockholders owned at the beginning of the year a total of 10,455, at the close a total of 10,327 shares, and that the balance of petitioner's outstanding stock, which was the same as in the former year, was held by 4,819 stockholders, none of whom owned as many as 358 shares.

It will thus be seen that up to this point the proof as to the conditions existing in 1918 and 1921 are for all practical purposes the same and it is this proof which we held in the former proceeding as insufficient to show control by the New Haven of substantially all of petitioner's stock. However, petitioner, for the year before us presents additional proof, this being that during that year, in addition to the 98,132 shares, or 44 per cent of petitioner's stock owned by the New Haven, 41,390 shares, or 18.56 per cent, was owned by 313 individuals, partnerships and corporations who, at the same time, owned or controlled 61,757 of the 1,571,179 shares of outstanding stock of the New Haven; that these stockholders usually gave their proxies to the representatives of the New Haven in the stockholders' meetings; and that in the taxable year in question all of the stock represented and voting at the annual stockholders' meeting, or 138,247 shares, was voted under proxy by three individuals who represented the New Haven interests, these proxies having in fact been given the New Haven.

It is insisted that these facts when considered with the others showing control of petitioner's properties under the lease and the

absolute ownership by the New Haven of 44 per cent of its stock and the wide distribution of the stockholdings in small individual amounts, are sufficient to prove an actual control of substantially all of that stock by the New Haven.

With this view we can not agree. At the most such proof would only indicate ownership and control through affiliated interests of 62.56 per cent of petitioner's stock even were we to consider that the New Haven controlled the additional 18.56 per cent of petitioner's stock by reason of the fact that it was owned by certain of its stockholders. However, the New Haven's stockholders who were also stockholders of petitioner, owned only 61,757, or less than 4 per cent of the 1,571,179 shares outstanding of the New Haven's stock and the individual owners are not shown to have been connected with the New Haven in any way other than as owners of this comparatively small amount of its stock. No circumstances are shown which indicate a control by the New Haven of the stock owned by these individuals and the fact that in the annual stockholders' meeting for the taxable year some of these and certain other stockholders of petitioner gave to the New Haven's representatives proxies to vote their stock does not indicate that such action was or could have been required of them. In petitioner's annual stockholders' meeting in 1921 there were 138,247 shares of stock voted, all of this being represented by proxies in the hands of the New Haven's representatives, 98,132 shares being the stock owned by the New Haven and the balance being the holdings of 138 small stockholders, some of them stockholders of the New Haven. The record shows nothing to indicate that the proxies of these 138 stockholders were given other than voluntarily, and the fact that in that year, and possibly in prior years, these proxies were voluntarily given, indicates an acquiescence and approval by these stockholders, in those years, of the control exercised by the New Haven of the organization of petitioner, but not control by it of the voting rights of the stock, which we have held is the " control " referred to in the statute. *Isse Koch & Co.*, 1 B. T. A. 624. It will be also noted that almost 38 per cent of the outstanding stock of petitioner during this year was owned by stockholders who had no manner of connection or community of interest with the New Haven.

In *Ice Service Co.*, 9 B. T. A. 386, we held that a taxpayer owning approximately 68 per cent of the stock of another company which owed it large sums, whose notes were endorsed by it and whose business was completely controlled and dominated by the taxpayer through officers and directors elected by it, was not affiliated with such company in contemplation of section 240 (c) of the Revenue Act of 1921. In this case, in holding that the ownership of ap-

proximately 32 per cent of the stock by minority stockholders who had no connection with petitioner, and who retained the voting rights on their stock, precluded a claim of affiliation, we said of the minority stockholder:

\* \* \* He still has the right to vote his stock and thus oppose the wishes of the majority if he so desires. True, the votes of the minority will not determine the policies of the corporation when the majority of the voting shares is held by one individual or corporation, but such control of the policies and financial affairs of the corporation as an entity does not amount to control of the individual stockholder or his stock. There must be a control of the voting rights. Appeal of *Canyon Lumber Co.*, 1 B. T. A. 473; *Adaskin-Tilley Furniture Co.* v. *Commissioner*, 6 B. T. A. 316.

The Circuit Court of Appeals for the Second Circuit, in approving the conclusion reached and affirming this decision, on appeal, *Ice Service Co.* v. *Commissioner of Internal Revenue*, 30 Fed. (2d) 230, said:

\* \* \* The theory of affiliation, resulting in a consolidated return for taxes, is that the income and invested capital are really the income and capital of a single enterprise, though carried on through the instrumentality of several corporations. See article 631, Treasury Regulations (1920 Ed.); Holmes, Fed. Taxes (6th Ed.) 281; *Alameda Inv. Co.* v. *McLaughlin*, 28 F., (2d) 81 (D. C. N. D. Cal.). Only when the outside interest—that is, the interest of the minority—is so small as to be practically negligible, are the two corporations to be treated as in receipt of a single income, requiring a consolidated return.

It is undoubtedly true that under the terms of the lease in question, executed long prior to the income-taxing statutes, all of the obligations of both corporations of every character fall ultimately upon the New Haven and the income of both is produced by the New Haven in the operation of its owned and leased properties, and, from an economic standpoint, it may well be argued that for taxing purposes the income of both should be considered as one, but with that question we are not concerned. The two corporations are distinct entities and we may only construe and apply the law as enacted, and this provides the basis for affiliation, and the right to file a consolidated return, as ownership or control of substantially all of the stock. We hold that petitioner was not affiliated with the New Haven during the taxable year in question.

The last issue is upon respondent's action in including in petitioner's income various amounts representing in each case the difference between the cost of and amount received by the New Haven for leased properties of petitioner, sold by the lessee under authority of the lease, or taken by condemnation by governmental authority.

The lease permits the New Haven to sell items of land and improvements from time to time when deemed by it advisable. The

proceeds of such sales are retained by it and the only obligation upon it is to replace such property sold with other property of an equal value. No increase in the rental is caused by such replacement. The New Haven also makes from time to time what in its judgment are necessary capital additions or improvements to the leased property, advancing the funds therefor, and petitioner is required by the lease to issue bonds or stock when called upon by the New Haven, which are sold and the proceeds used to reimburse the latter for the advances made. The New Haven, in the case of such issue of stock or bonds, pays from that time forward an increased rental by reason of its obligation to pay all bond interest and $7 a share on all outstanding stock. Petitioner and the New Haven each carry an account on its books of the advances made by the latter for additions and improvements. This account usually represents a large amount and when, in the opinion of the New Haven, it reaches a sum justifying or calling for an issue of stock or bonds, the call for such issue is made. However, in the meantime the New Haven is from year to year making casual sales of items of the leased property which it deems are no longer needed and the practice has consistently been to credit the proceeds of such sales to this account of advances for additions and betterments, thus reducing to this extent the sum for which additional stock or bonds would be issued at some time in the future. It follows, we think, that from the date of the credit given by the New Haven and taken by petitioner the proceeds of such sales are represented by capital additions and improvements and that upon giving such credit the New Haven has complied with its lease obligation to replace such property sold with property of a similar value. The giving and taking of the credit against the accounts of advances shows that the parties have consistently considered such to have been the result. Petitioner has in each case, upon taking such credit against the New Haven account on its books, charged the difference between the cost of the property sold and the price realized to profit and loss, as a gain or loss, depending upon whether cost was below or above the price realized, and has carried such adjustment into its capital asset accounts.

Petitioner contends that in none of these sales, whether voluntary or by condemnation, is a profit or loss realized which may be reflected in its income in 1921, as such transactions, as to petitioner, represent not sales but exchanges of property falling within the exception provided by section 202 (c) of the Revenue Act of 1921, providing:

(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless

the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

(1) When any such property held for investment, or for productive use in trade or business (not including stock-in-trade or other property held primarily for sale), is exchanged for property of a like kind or use;  *  *  *

With respect to the items of gain included as pertaining to the condemnation of an easement by the City of Boston, and the taking of real estate by condemnation exercised by the Federal Government, petitioner contends that, it being on an accrual basis, in neither case, even though it should be found that the transactions were ones on which it realized taxable profits, were such profits income in the year 1921, but pertained to the year in which the properties were taken, irrespective of the period in which the amount of compensation to be paid for the taking was determined, or the year in which such compensation was paid. It further contends with respect to the last mentioned item that the United States can not constitutionally reduce by taxation just compensation paid for property which it has taken.

In respect to the proceeds realized from the conversions under condemnation proceedings, and which constitute almost all of the amount in controversy under this issue, it is noted that the facts proven show that the entire amount realized in each instance was applied by the lessee to the cost of capital additions and improvements to petitioner's property and this amount was, from the date received, represented by such capital additions. Section 234 (a) (14) of the Revenue Act of 1921 provides:

If property is compulsorily or involuntarily converted into cash or its equivalent as a result of  *  *  *  (c) an exercise of the power of requisition or condemnation, or the threat or imminence thereof; and if the taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted,  *  *  *  or in the establishment of a replacement fund, then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds.  *  *  *

Even though it should be concluded that these involuntary conversions resulted in a realization of taxable gain to petitioner, the immediate disposition of the entire proceeds of the sale by investment in property which is undoubtedly " of a character similar or related in service or use to the property so converted " would entitle petitioner to a deduction representing the entire amount of the gain realized, resulting in the elimination from its net taxable income of all of such gain.

However, the first question raised by petitioner, that all of the conversions are in fact, as to petitioner, exchanges of property and

not sales, affects the entire amount. If petitioner is correct in this contention, no portion of the sale price received by the New Haven for these transfers of petitioner's properties can be included in petitioner's income.

Upon consideration of this question it appears to us unnecessary to pass upon the question of whether these transactions are ones falling within the provisions of section 202 (c) of the Revenue Act of 1921. Even if not exchanges of property for property of a like kind or use, the circumstances in our opinion show them to be transactions from which petitioner has derived no income.

The provisions of the lease in question show clearly that, as one of the considerations moving to it in return for the rental paid, the New Haven possesses the right to dispose of items of the leased property, whereupon it becomes obligated to replace them with similar property of an equal value. As a necessary incident of the exercise of this right by the New Haven, it is provided that petitioner will at its request execute, through its officers, the necessary conveyances. The consideration paid by the purchaser secured by the New Haven is retained by the latter. The result to petitioner of the conversion is known and determined before the conveyance is made, this being that it will stand possessed of other assets of a character or use similar, and a value equal, to those conveyed. As we view these transactions, the New Haven does not dispose of those items of property merely as an agent of petitioner, but by its right acquired under the lease contract—a right bought and paid for in the rental reserved. It does not receive the payments made for these properties as agent for petitioner, but in its own right as funds to which it has right and title, subject merely to its obligations to convey to petitioner similar property of an equal value to that which it has sold.

Respondent insists in effect that a disposition of property under the lease provision constituted two distinct and separate transactions—first, a sale and transfer of the property by petitioner through the New Haven as its agent, for a sum of money, and the receipt of this sum by the New Haven as such agent, and, second, the investment of these proceeds of sale by petitioner, through its agent, in other property.

With this we do not agree. Petitioner has for a stated rental granted the New Haven the use of its properties for 99 years and has given it the right to dispose of such items of property during that period as it deems have become unnecessary to the property as a whole and replace such items by ones of a similar value and for which a necessity exists. Does the fact that, during the course of the transaction under which such items of property are disposed of

and replaced, the various steps and final result of which in each case are fixed and determined before the first step is taken, certain sums of money come into the hands of the New Haven make such sums income to petitioner when it does not receive them and has no control over or disposition of them at any time? In this connection, it must be remembered that the use of these funds by the New Haven is in the discharge of *its own obligation* to replace the property conveyed.

We can not agree with respondent that the several steps of this transaction constitute separate transactions and that upon conveyance of the property by petitioner and the receipt of the purchase price by the New Haven under the sale it has negotiated, the transaction is a closed one as to petitioner, who thereupon, for income-tax purposes, is in receipt of the consideration paid. Cf. *United States* v. *Mellon*, 279 Fed. 910; (affd., 281 Fed. 645.) As we can see it, petitioner has not then received its consideration which is the property to be conveyed to it to replace that taken. It can not be, in our opinion, charged with receipt of income in respect to the payment. At no time can it exercise an option by cancellation of the lease, and, instead of the replacement property, take the proceeds of the sale.

The court in *Eisner* v. *Macomber*, 252 U. S. 189, defines income as " not a gain *accruing* to capital, not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value, *proceeding from* the property, *severed from* the capital however invested or employed, and *coming in*, being *derived*, that is *received* or *drawn* by the recipient [the taxpayer] for his *separate* use, benefit and disposal." We can not see that petitioner, as a result of these disposals of property has received anything meeting this definition.

The effect of these transactions, in so far as petitioner is concerned, can be at the most merely an appreciation in value of petitioner's reversion, an unrealized capital gain, by reason of the fact that the leased property as a whole is rendered more usable and consequently of greater value to the lessee and such value may possibly be maintained beyond the lease term. To consider them sales of property by petitioner, and the proceeds as gross income to petitioner, is to overlook not only the fact that the proceeds were received and used by the New Haven with no obligation upon its part except to replace the property at the expiration of the lease period of 99 years, but the fact that the property conveyed represents both the reversion of petitioner in such property and the leasehold interest therein belonging to the New Haven—its right to use for a remaining period of more than 70 years, which right would have a present value many times that of the reversion. Petitioner's participation

in or use and enjoyment of any gain realized is necessarily postponed until the termination of the lease. It receives no increased rental by reason of the transactions.

The conclusion reached makes it unnecessary to pass upon the other questions raised by petitioner under this issue.

Reviewed by the Board.

*Judgment will be entered pursuant to Rule 50.*

ARUNDELL dissents on the third point.