F. Brody and Sons Company, Petitioner, *v.* Commissioner of
Internal Revenue, Respondent.

Docket No. 12128.    Promulgated September 16, 1948.

*James F. Swift, Esq.*, for the petitioner.
*George E. Gibson, Esq.*, for the respondent.

300

**OPINION.**

HARLAN, *Judge*: The Commissioner contends that when the taxpayer in 1918 distributed checks to its stockholders in proportion to their existing stockholdings in a total amount equal to its surplus and special reserve accounts, or $227,437.63, and concurrently therewith delivered stock to said stockholders having a par value of $275,000 upon receipt of checks from its stockholders of $275,000, the taxpayer in legal effect declared a stock dividend of $227,437.63 and actually sold stock only to the value of $47,562.37. The Commissioner contends also that the taxpayer is entitled, under the provisions of section 718 (a) (1) of the Internal Revenue Code,[1] to include only $47,562.37 in its equity invested capital for the taxable year instead of $275,000 which the taxpayer did include.

The Commissioner argues that the corporation in June 1918 did not intend that its dividend checks be actually cashed except for immediate return as a payment back to the corporation for the new stock issued; that there was $2,862.13 in the corporation's bank account on June 24,

---

[1] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

(1) MONEY PAID IN.—Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

     ＊       ＊       ＊       ＊       ＊       ＊       ＊

1918, when these checks, aggregating $227,437.63, were written; and that the bank account of at least one of the stockholders, Harry Brody, president of the company, had an opening balance of but $293.23 on June 24, 1918. On that date Brody deposited, however, $99,014.73, which included the dividend check of $83,014.73, and then wrote one check for $16,000 and another for $82,900 payable to petitioner in payment for the stock issued to him. In short, the Commissioner argues that the only real cash involved, so far as the corporation was concerned, was $47,562.37 which the stockholders actually paid in, and that in reality the rest of the transaction was a conversion of the corporate surplus and special reserve accounts into a stock dividend.

The Commissioner cites *Theresa Zellerbach*, 2 B. T. A. 1076, 1083, wherein a corporation, in order to avoid criticism from its customers, attempted to give what was in reality a stock dividend the appearance of a cash dividend. Ninety-two per cent of the stockholders knew that in reality a stock dividend was being declared, but the minutes were so drawn as to have the appearance of creating a cash dividend. No dividend checks were issued and these stockholders gave no checks for the stock. Eight per cent of the stockholders who were not informed did make a payment for the stock issued, but the amount of this payment was later returned to them. We discern little application of these facts or the law involved to the case at bar.

The Commissioner also quotes from *W. Q. Wright*, 10 B. T. A. 806, to the effect that the real understanding between the stockholders and directors and the financial ability to issue cash dividends should receive greater consideration than the actual book entries. In that case the Board of Tax Appeals held that the facts showed the issuance of a stock dividend rather than a cash dividend, as contended for by the Commissioner. However, the *Wright* case in facts is so far from the facts in the case at bar that it furnishes little help. To illustrate, the stockholders therein issued promissory notes for the stock and agreed among themselves that the notes should never be paid and no dividend checks were ever issued by the corporation.

The Commissioner also cites, without comment, *United States* v. *Mellon*, 279 Fed. 910, and *United States* v. *Davison*, 1 Fed. (2d) 465. In the *Mellon* case a very substantial majority of the stockholders entered into a plan whereby a certain amount of a new stock issue was to be sold for cash to raise needed funds and the rest was to be issued to the stockholders agreeing to the plan in satisfaction of a dividend of $100 on the outstanding stock which it was agreed would be declared. The stockholders, in the agreement, also agreed to purchase for cash from those stockholders who were not in on the plan and who might not wish to accept the stock in payment of the contemplated dividends.

The Court held that such an arrangement was only a disguised cash dividend, that in reality it was a stock dividend, and that the taxpayer should not be taxed thereon. The *Davison* case is very similar to the *Mellon* case and is just as easily distinguishable from the facts in the case at bar.

In the case at bar the corporate minutes clearly provide for a cash dividend and make special provision for any stockholder who does not wish to apply that dividend to the purchase of new stock. There is not a hint that the stockholders had any contrary secret understanding. Dividend checks were issued and, while the bank account of petitioner could not have cashed those checks without the petitioner borrowing money or without its relying upon the receipt of checks from the stockholders, the amount of petitioner's liquid assets during June 1918 was such as to indicate that such borrowing could easily have occurred if necessary. The standing of the corporation, furthermore, with its bank is indicated by the bank's willingness to honor petitioner's checks on June 1, 1918, in a sufficient amount to create an overdraft of $10,800. This does not indicate a corporation in a weak position to borrow money when needed.

In *Eugene E. Paul*, 2 B. T. A. 150, dividend checks were issued to stockholders but never deposited by them. The checks were immediately endorsed back to the corporation upon receipt by the payee and stock certificates were given to the payee in exchange. That case presented a much stronger case on the facts against the reality of a cash dividend than the one at bar, yet the Board of Tax Appeals, at page 152, said:

* * * The agreement between the individual stockholders to purchase new stock with dividends when paid does not serve to change the character of the corporate action and make that a stock dividend which was intended to be a cash dividend.

* * * We do not regard the fact that the corporation had insufficient cash on hand to pay the dividend as of controlling importance. It had a surplus in excess of the dividend declared, and the indebtedness to its stockholders existed irrespective of that fact. The right to declare a dividend from surplus profits was exercised by the directors and it became their duty to provide ways and means to make payment thereof. If surplus profits have in fact been earned and are invested in property used in the business of the corporation, a dividend may properly be paid by borrowing money. * * *

Petitioner relies heavily upon *W. J. Hunt*, 5 B. T. A. 356. The deficiency in that case arose out of petitioner's claim that certain stock received by him constituted a nontaxable stock dividend. The Board of Tax Appeals held, however, that the stock had been purchased by the petitioner and that the dividend was a cash dividend. Thus the Commissioner and the petitioner in the *Hunt* case contended for ex-

actly the opposite of the legal principles which they now present in the case at bar.

In the *Hunt* case the corporate directors, on December 1, 1917, recommended to the stockholders a capital stock increase and issue of $35,000 to be offered to existing stockholders in proportion to outstanding holdings. This plan was approved by the stockholders. On December 24, 1917, the directors declared a $60 per share dividend on all stock outstanding on January 1, 1917. Prior to this declaration of dividends all of the stockholders agreed that they would apply the dividend checks to the purchase of the new stock. The report discloses the following transaction:

Subsequent to the adoption of the resolutions by the board of directors and the stockholders at the meeting held on December 1, 1917, but prior to the declaration of the dividend on December 24, 1917, it was agreed between all the stockholders, including those who were members of the board of directors, that they would take stock and pay for it with the money distributed by the corporation to the extent of $35,000, and that the checks received from the corporation should be deposited to the credit of the individual stockholders whose checks in payment for stock would be simultaneously deposited. When the contemplated dividend was declared the corporation had a surplus on hand at the date of the resolution, December 24, 1917, in excess of $39,000.

At the meeting of the directors on December 24, 1917, the stockholders delivered to the treasurer of the corporation their personal checks aggregating $35,000 as follows: * * *

The above checks were given in payment for stock on December 24, 1917, but were not to be presented for payment until the corporation's checks representing the pro rata share of each stockholder of the dividend were deposited. Some of the stockholders who signed the above checks had no money in the banks upon which they were drawn; others were for amounts in excess of the respective balances of their personal bank accounts, and by agreement were held by Merchant's Bakery, Inc., until January 2, 1918, when the checks of the corporation were made out in favor of all of the stockholders in amounts aggregating $39,000 as follows: * * *

The treasurer of the Merchants Bakery, Inc., deposited the checks issued to the stockholders by the company in amounts aggregating $39,000 in the bank to the personal credit of the stockholders and simultaneously deposited the stockholders' checks which he held aggregating $35,000, which checks had been endorsed by the respective stockholders. Prior to such deposit on January 2, 1918, the cash of the company in the bank was $10,600.

On the same day, January 2, 1918, the stockholders received their additional stock in the corporation.

### Concerning those facts, the Board held:

The dividend which was declared in this case, according to the resolution by which it was declared, was a cash dividend. The fact that the recipients of that dividend agreed to apply it to the purchase of stock is not sufficient to change the nature of the transaction. It is not material what the recipients of the dividend agreed to do with it when it was received. A violation of the agreement of the stockholders to purchase stock with that dividend would not have

given the corporation the right to sue for the application of that money to the purchase of stock.

\* \* \* \* \* \* \*

In our opinion, the facts in the case of *United States* v. *Mellon*, 281 Fed. 645, and *United States* v. *Davison*, 1 Fed. (2d) 465, are distinguishable from the facts in this case, and hence the decisions of the courts in those cases are not determinative of the issue here. Based on the facts in the instant proceeding, we are of opinion that the dividend in question was a cash dividend.

The Board of Tax Appeals in all cases in which facts approximating those in the case at bar have been involved has followed the *Paul* and *Hunt* cases. See *J. E. Brading*, 17 B. T. A. 436; *Margaret B. Payne*, 19 B. T. A. 1305; and *Harry Makransky*, 35 B. T. A. 395. While it is to be noted that in the *Makransky* case the Board also referred in its decision to a possible presumption against the issuance of a stock dividend, in that case, because of the wording of the stock certificate, the decision had adequately discussed the merits of the case and based its conclusions on the precedent of *Eugene E. Paul*, *supra*, before mentioning any presumption and apparently did not seriously base its conclusions on the presumption, which it indicated was of questionable existence. The Board in the *Makransky* case laid emphasis on the fact that one of the stockholders accepted his dividend in cash. It is to be noted in the case at bar that a specific provision was made in the resolution authorizing the dividend that "any present stockholder's share of such additional stock, which was not purchased by said stockholder, be offered to the remaining stockholders pro rata." Thus, in the case at bar, it was clearly provided that if the stockholder did not desire to purchase his stock and did desire to retain his dividend, it was clearly within his rights.

Also, in the *J. E. Brading* case, the Board referred to the presumption of correctness of the determination of the Commissioner, but again the opinion in the case was based firmly on the precedent of *W. J. Hunt*, *supra*.

In the *Margaret B. Payne* case the essential facts pertaining to the issuance of the dividends and the purchase of the stock were set forth as follows:

Checks were issued to each stockholder equal in amount to the par value of the stock issued to him, but those checks were not delivered to such stockholder, but were held until a convenient time, when each stockholder endorsed his check and received the stock. Those checks were what are known as "counter checks," and not the regular voucher checks. They were, however, carried through the bank, where appropriate debit and credit entries were made.

In that case the dividend was declared by the Board of Tax Appeals to be a cash dividend, in the following words:

From a legal point of view the resolutions of the stockholders are what determined the legal rights of the parties, as well as the legal result of the operations.

That a cash dividend of $200,000 was authorized by the resolutions dated April 1, 1920, is patent on the face of the instrument. In carrying out the provisions and instructions contained in those resolutions, checks were issued to each stockholder. While it may be that a mutual understanding and agreement existed among the stockholders that each would take additional stock to the amount of his check, he was not legally bound to do so and could have demanded the cash. The procedure carried out was to all intents and purposes a purchase of stock, and payment therefor was by an endorsed check. It was as much a purchase of that stock as though he had cashed his check and paid the money for the stock.

As in the *Paul* and *Hunt* cases, the *Payne* opinion makes no reference to any presumption as supporting the opinion.

However, in the case at bar there is one of the very strongest presumptions known to the law in favor of the contention of the petitioner. That is, that there is a presumption of legality and compliance with the law as against illegality. See *Athens Roller Mills, Inc.* v. *Commissioner*, 136 Fed. (2d) 125; *Sutherland* v. *Bohn*, 33 Fed. (2d) 643; and *Fidelity & Deposit Co. of Maryland* v. *Grand National Bank*, 69 Fed. (2d) 177.

In 1918 section 1641–B of the Code of Iowa, 1913 Supplement, was in force and effect, the material part of which reads as follows:

That from and after the passage of this act no corporation organized under the laws of the state of Iowa, except building and loan associations * * * shall issue any capital stock or any certificate or certificates of shares of capital stock, or any substitute therefor, until the corporation has received the par value thereof. If it is proposed to pay for said capital stock in property or in any other thing than money, the corporation proposing the same must, before issuing capital stock in any form, apply to the executive council of the state of Iowa for leave so to do.

In the case at bar there is no evidence of any such application having been filed and the report to the Secretary of State of the State of Iowa that the stock was paid for in cash is a clear indication that no such application was filed.

Therefore, based upon the precedents of the *Paul* case and the *Hunt* case, and the many cases which have followed those precedents, and also on the presumption of the legality of the stock sale of the taxpayer herein which was conducted in 1918, it is our conclusion that the contentions of the Commissioner that a stock dividend was declared at that time can not be sustained.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

MURDOCK and OPPER, *JJ.*, dissent.

----

DISNEY, *J.*, dissenting: I am unable to bring myself to believe that section 718 (a) (1) of the Internal Revenue Code, requiring money to be previously paid in for stock in order that the amount may be included in equity invested capital, can properly be applied under the

facts in this case. The majority opinion holds that the distribution made by the petitioner to its stockholders in 1918 was a cash dividend and that the stock simultaneously issued to them was sold for cash. The resolution of June 6, 1918, never uses the word "dividend." The sale of $16,400 in stock to E. P. Brinker and W. D. Beard was subject to "an agreement as may be provided by said board of directors," as to which we know nothing further. W. D. Beard received $8,200 in stock, yet there is no evidence as to whether he ever paid in money or even a check. Brody did not have the money to pay for his stock and no showing is made as to whether the others had the necessary funds to cover their checks. The corporation's check was not good. Such check kiting, in my opinion, does not represent money within the purview of the above statute. There is no evidence as to the amount of petitioner's liquid assets during June 1918. The fact that there was an overdraft of $10,800 which was honored is by the majority taken to indicate a strong borrowing position. It does not indicate such position beyond $10,800, which seems of little importance, considering the $275,000 here involved, and such overdraft certainly indicates a weak financial position.

The majority opinion relies upon the *Hunt*, *McKransky*, and *Paul* cases. The *Hunt* case is based upon the fact of debt created by resolution. No such debt was here created. Moreover, in the *Hunt* case the agreement of the stockholders was before the declaration of the dividend and the corporation had an excess surplus greater than the dividend. The *Hunt* case is distinguished in *George I. Smith*, 21 B. T. A. 782, because of the obligation created by the earlier declaration of dividend, while in the *Smith* case it was in the same resolution. Here, if there was any declaration of dividend it was in the same resolution with the stock offer. The *Smith* case also points out that the *Hunt* case involved an agreement to pay back the money by the execution of checks. The *Paul* case too depends upon the fact that a debt was created by the declaration of dividend prior to the resolution authorizing increase in stock. The *McKransky* case offers no authority for the conclusion here, for therein the dividend, which was held to be in cash, was declared upon preferred stock, the certificates for which prohibited a stock dividend. Moreover, checks were paid in by the holders of both preferred and common stock and one stockholder, an employee, received cash and had no option to take stock. As the majority opinion states, the *Brading* case also relied upon is based upon the *Hunt* case. In the *Brading* case there was a stock issue of $40,000, with a surplus of only $27,000, and an agreement that the remainder was to be taken care of by a real estate deal eighteen months later. Such circumstances obviously are no basis for the majority conclusion here. Believing that money was not paid in for the stock within section 718 (a) (1), I dissent.

TURNER, VAN FOSSAN, ARNOLD, and HILL, *JJ.*, agree with this dissent.